AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 06/03/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____AP_____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| June 3, 2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____KC____ DEPUTY |

United States of America

v.

Christopher James STILES and
Adam Blair SMITH,

Defendant(s)

Case No.   5:21-mj-00395

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 4, 2020, in the county of Riverside in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 21 U.S.C. § 846 | Distribution of 50 grams or more of methamphetamine and conspiracy to do the same |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/S/_____
*Complainant's signature*

Valerie H. Atwood, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 3, 2021

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Valerie H. Atwood, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of an application for a criminal complaint against and arrest warrants for Christopher James STILES and Adam Blair SMITH for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (distributing at least 50 grams of methamphetamine) and 21 U.S.C. § 846 (conspiracy to do the same) on December 4, 2020.

2.   This affidavit is also made in support of an application for a warrant to search 73030 San Nicholas Avenue, Unit A, Palm Desert, California 92260 (the "SUBJECT PREMISES") as described in Attachment A-1, for the items to be seized in Attachment B,  which are the evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 18 U.S.C. §§ 922(a)(1)(A) (dealing firearms without a license), and 26 U.S.C. § 5861(d) (possession of an unregistered firearm) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.   Finally, this affidavit is made in support of an application for a warrant to search a 2005 black Land Rover bearing California license plate 6EJW656 and VIN SALAA25415A302173 (the "SUBJECT VEHICLE") as described in

Attachment A-2, for the items to be seized in Attachment B, which are the evidence, fruits, or instrumentalities of the Subject Offenses.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of official reports, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and it does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since January 2017.  I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program as well as the ATF Special Agent Basic Training Program. As a SA, I have received training in Federal firearms and narcotics laws and regulations. I regularly refer to these laws and regulations during the course of my duties and I have experience investigating these crimes. I am also familiar with how digital devices are used to facilitate and conceal firearms and drug trafficking.  Prior to working for the ATF, I received a Bachelor of Arts degree in Philosophy from the University of Rochester, a Master of Arts degree in Middle Eastern Studies

from the University of Texas at Austin, and a Master of Arts
degree in International Security.  I am currently assigned to
the ATF Riverside, California Field Office.

### III.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Confidential Informant Introduces STILES to an ATF
       Undercover Agent**

6.    On November 30, 2020, ATF Task Force Officer ("TFO")
Nick Kean contacted me with information from a Confidential
Reliable Informant ("CRI") that an individual known as "Chris
Stiles" (later identified as STILES) is involved in the sales of
firearms and various kinds of drugs.  The CRI told TFO Kean that
STILES has a firearms source who manufactures privately made
firearms (sometimes called "ghost guns"), including fully
automatic machineguns.  The CRI also told TFO Kean that STILES
was currently offering to sell two AR-15 type privately made
firearms and two pistols.  TFO Kean told the CRI to give STILES
the telephone number for an ATF Undercover Agent ("UC-1") and
indicate to STILES that UC-1 is interested in purchasing
firearms.

7.    On the same date, at approximately 11:58 AM, UC-1
received a telephone call[1] from number 951-472-6790.  UC-1 did
not answer the call; however, the caller left a voicemail and
identified himself as "Chris" (presumably STILES).  Shortly
thereafter, UC-1 and STILES exchanged a series of text messages
via telephone.  During the exchange, UC-1 expressed interest in

---

[1] All the telephone calls and messages referenced in this
affidavit were recorded, and I've listened to the recordings and
read the messages.

purchasing firearms from STILES.  STILES responded and asked UC-1 to contact him via Signal.  Signal is an internet-based encrypted messaging and voice-call service.

8.    From November 30, 2020, to December 4, 2020, UC-1 and STILES exchanged a series of messages and voice calls via Signal.

    a.    On November 30, 2020, at approximately 2:17 PM, UC-1 received a Signal voice call from STILES.  During the call, STILES asked UC-1 what he was looking for.  UC-1 responded that he was told that STILES currently had two AR-15 type rifles and two pistols for sale.  STILES replied that he had "more than that" and began listing different models of firearms he has available for sale.  STILES further stated that the firearms he offers for sale are all "ghosts" (common vernacular for privately made firearms) and that he "can have the ARs be automatic too."  UC-1 and STILES then discussed prices and the quality of firearms that STILES had for sale.  Regarding the quality of the privately made firearms, STILES commented, "These are all fuckin' legit . . . they been doin' it for a long time."  Also during the call, UC-1 indicated he was interested in purchasing firearms from STILES on Thursday, December 3, 2020.  UC-1 and STILES continued texting and calling each other over Signal that day, and STILES eventually told UC-1 that he couldn't have the firearms ready until December 4.

    b.    Between December 1 and December 4, 2020, UC-1 and STILES exchanged a series of Signal messages.  During the exchange, STILES sent UC-1 a photograph of what appeared to be

psilocybin mushrooms (commonly referred to as "shrooms").
STILES followed the photograph with a price quote for the
shrooms.  UC-1 replied, using vague language, that he typically
only deals in methamphetamine.  STILES replied, "I can get u
pounds of that at 19 on singles Breaks on multiples."  UC-1
advised STILES that he was interested in also purchasing
methamphetamine during the firearms transaction scheduled for
that Friday.  STILES also sent UC-1 a photograph of what
appeared to be an Intratec 9mm pistol.  STILES and UC-1 then
negotiated the sale price of the 9mm pistol, and UC-1 agreed to
purchase the pistol for $1,400.

      c.  On December 4, 2020, at approximately 3:51 PM,
UC-1 received a Signal voice call from STILES.  During the call,
STILES told UC-1 that the privately made firearms were not ready
for sale, but his associate with the Intratec 9mm pistol was
nearby and ready to sell the firearm to UC-1.  STILES and UC-1
then discussed the associate with the 9mm pistol.  STILES
advised UC-1 that his associate with the pistol is the person
that introduced STILES to the source of privately made firearms.
STILES indicated that he, the associate with the 9mm pistol, and
the source of privately made firearms are all in business
together.  During further Signal messages on December 4, 2020,
STILES advised UC-1 that STILES and his associate with the
Intratec pistol would be arriving at the deal together.

    9.  I identified "Chris Stiles" as Christopher James
STILES.  TFO Kean showed a DMV photograph of STILES to the CRI,
and he/she positively identified STILES as the individual he/she

knows as "Chris Stiles."  During a records check of STILES, I learned that he was not a convicted felon.

10.  I queried the telephone number (951) 472-6790 in law enforcement databases and determined that the phone number is registered to a "CHRISTOP STILES" and is a current active wireless number associated with the T-Mobile USA telephone company.

### B.  First Controlled Purchase of Meth and a Gun from STILES & SMITH on December 4, 2020

11.  On December 4, 2020, ATF SAs and members of the Riverside County Gang Impact Team met at an ATF controlled undercover location ("UC location") in Riverside, California, and set up surveillance in the area.[2]  At the UC location, UC-1 was given ATF funds for the purchase of firearms and any additional contraband that was present.

12.  At approximately 5:00 PM, surveillance units saw a black Lincoln SUV with the California license plate 5LRU994 and a small silver Sedan pulling up to the rear of the location. UC-1 and a second ATF undercover agent ("UC-2") motioned towards the vehicles to enter the garage of the UC location.  The small silver Honda pulled into the garage, and the black Lincoln SUV parked outside.  STILES was driving the black Lincoln SUV, and an unidentified white male (later identified as Adam SMITH) was driving the silver Honda sedan.

---

[2] The UC location is equipped with covert recording devices that clearly capture sound and video from multiple angles inside the UC location.  I have reviewed the recordings from all the controlled purchases that I discuss in this affidavit.





STILES                                SMITH[3]

13.    SMITH got out of the driver's side of the silver sedan carrying a black briefcase, and STILES got out of the black Lincoln SUV before both walked into the UC location.  UC-1, UC-2, STILES, and SMITH gathered around a bar top in the UC location.  SMITH opened the briefcase and removed an Intratec 9mm pistol and a magazine loaded with 29 rounds of ammunition.  UC-1 asked SMITH if he could lower the sale price of the 9mm pistol, and SMITH indicated that UC-1 should ask STILES.  STILES advised that he could not lower the price.  UC-1 then handed $1,400 for the Intratec 9mm pistol to STILES.  STILES then counted the money and handed it to SMITH.

14.    SMITH, in a vague manner, reminded STILES that he also has methamphetamine for sale.  STILES then asked UC-1 if he was still interested in purchasing methamphetamine.  SMITH then told UC-1 that he currently has a half pound of methamphetamine in his possession.  SMITH then quoted a sale price of $1,300 for the suspected methamphetamine.  SMITH, using his own scale he

---

[3] These images are cropped screen captures from the electronic surveillance taken during the controlled purchase.

brought in his briefcase, weighed the suspected methamphetamine that he had also retrieved from his briefcase.  UC-1 then paid SMITH $1,300 for the suspected methamphetamine.

15.   In total, UC-1 and UC-2 purchased the following from STILES and SMITH on December 4, 2020:

      a.   229 grams of pure methamphetamine, as confirmed by a DEA laboratory analysis;

      b.   29 Rounds of 9mm ammunition; and

      c.   An Intratec AB-10 9mm handgun.



**C.   Identification of SMITH**

16.   On December 5, 2020, TFO Kean took an electronic surveillance photograph from the controlled purchase and

submitted it to the Riverside County Sheriff's Facial
Recognition Unit.  The unit identified a possible match for the
subject Adam SMITH.  I sent a photograph of SMITH to UC-1 who
positively identified SMITH as the second individual at the
controlled purchase.  California Department of Correction
Records and previous booking information for SMITH indicated
that he was missing fingers on his left hand, and the UCs
recalled that the individual at the controlled purchase was also
missing the tips of what appeared to be his left middle, ring,
and pinky fingers.



17.  Additionally, in his conversations with UC-1 leading up to the December 4 purchase, STILES said that his firearm source is affiliated with an "MC," common slang for criminal gangs that identify as "motorcycle clubs."  I reviewed SMITH's criminal history and queried him in law enforcement databases and learned that SMITH is a multi-convicted felon and a documented Vagos Outlaw motorcycle gang member known by the nickname "Knucklehead."

### D.    Second Controlled Purchase of Guns and a Silencer from STILES & SMITH on December 15, 2020

18.  Between December 5 and December 15, 2020, STILES and UC-1 continued communicating on Signal.  During the exchange, STILES and UC-1 set up a second firearms sale.  On December 15, 2020, members of the ATF Riverside Field Office, UC-1, a third undercover agent ("UC-3"), and members of the Riverside County Gang Impact Team ("GIT") met at the UC location and set up surveillance in the area.

19.  At approximately 5:45 PM, surveillance units saw the same black Lincoln SUV registered to STILES approaching the UC location.  UC-1 and UC-3 waved the vehicle into the garage of the UC location.  STILES was driving the vehicle and SMITH was in the front passenger seat.  STILES first set a black plastic Glock pistol case upon the bar area, and STILES went back to the SUV and retrieved a long cardboard box from the back seat. SMITH then exited the front passenger seat and UC-1, UC-3, STILES, and SMITH all gathered around the bar top.

20.    STILES opened the box and displayed two privately made AR-15 type rifles, two privately made pistols, and a suspected silencer.  STILES told UC-1 that the two privately made ARs were fully automatic.[4]  UC-1 then handed STILES $3,600 for the two AR-style rifles.

21.    SMITH told UC-3 that he had fired approximately 30 rounds through the silencer and indicated that the silencer reduced the noise.  UC-3 then paid SMITH $2,900 for the two privately made handguns and the suspected silencer.  SMITH took the money and handed it to STILES.  Approximately 30 minutes later, SMITH and STILES left the UC location.

22.    In total, UC-1 and UC-3 purchased the following from STILES and SMITH on December 15, 2020:

    a.    Black Glock Handgun case bearing the serial number SGV290;

    b.    Two black rifle magazines;

    c.    Two Polymer 80 privately made 9mm handguns;

    d.    Two AR-style privately made rifles; and

---

[4] An ATF laboratory later examined those ARs and determined that they were not, in fact, automatic machineguns.

      e.    A black suspected silencer.



### E.    ATF Analysis of Silencer

23.    A firearms enforcement officer with the ATF Firearms Technology Criminal Branch ("FTCB"), trained and experienced in determining whether firearms fall under the National Firearms Act ("NFA"), tested and examined the suspected silencer from the December 15 purchase.  He issued a report stating that he test-fired the suspected silencer with a sound-measuring device and partially disassembled the suspected silencer to examine it.  He determined that the suspected silencer reduced the sound of his test shots, and he thus opined that it is a device for silencing, muffling, or diminishing the report of a portable fire arm and is a "firearm silencer" as defined in 18 U.S.C. § 921(a)(24), a "firearm" as defined in 26 U.S.C. § 5845(a)(7), and that it bears no NFA manufacturer or maker's marks of identification or serial number as required by 26 U.S.C. § 5842.

**F.    ATF Records Query of SMITH & STILES**

24.    After the December 15 purchase, I queried both SMITH and STILES and determined that there was no identifiable record for either subject within the National Firearm Registration and Transfer Record.

25.    Additionally, there was no identifiable record for either of the subjects within the Federal Licensing System as a current, former, or pending applicant/licensee to deal firearms.

**G.    Third Controlled Purchase of Guns from STILES on January 28, 2021**

26.    Between January 11 and January 28, 2021, UC-1 and STILES exchanged a series of messages and calls on Signal regarding an upcoming firearm purchase.  On January 11, STILES sent UC-1 a message asking when UC-1 wanted to place the next order.  On January 19, STILES sent UC-1 photographs of a handgun and an AR-style firearm.  On January 23, UC-1 and STILES agreed to meet at the UC location and STILES agreed to sell UC-1 firearms on January 28.

27.    On January 28, 2021, members of the ATF Riverside Field Office, ATF undercover agents UC-1, UC-2, UC-3, and GIT members met at the UC location and set up surveillance in the area.

28.    At approximately 4:20 PM, surveillance units saw the STILES's black Lincoln SUV approaching.  The UCs waved the vehicle into the rear of the UC location.  STILES was driving the vehicle and no one else was present.

29.    Inside the UC location, STILES and the UCs negotiated prices for various firearms that STILES brought.  During their conversations, STILES brought up additional items that he could sell to the UCs in the future, including ten Glock-type privately made firearms.  STILES also added that if he could obtain a 3D printer, he'd begin making Glock switches and sell them with those firearms.[5]

30.    During the deal, the ATF UCs purchased the following items from STILES:

        a.    A Ruger .45 caliber handgun;

        b.    A Ruger handgun case;

        c.    A Polymer 80 privately made 9mm handgun;

        d.    A Sota Arms, Inc., Model SA15, .223 caliber rifle (I measured the barrel length and determined that the barrel is approximately 9 inches long with the bolt closed and approximately 12 inches with the bolt open, making it a short-barreled rifle under 26 U.S.C. § 5845(a)(3)); and

---

[5] Glock switches are devices that can convert a Glock-type handgun to fire automatically, and thus the switches themselves are classified as "machineguns."  See 26 U.S.C. § 5845(b) ("The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.").  They are illegal to possess under 18 U.S.C. § 922(o), and they are highly dangerous.

     e.   Forty rounds of 9mm caliber ammunition.



31.  Approximately 30 minutes later, STILES got back in the Lincoln SUV and left the UC location.

### H.  Fourth Controlled Purchase of Guns and Methamphetamine from STILES on March 4, 2021

32.  Between January 28 and March 4, 2021, UC-1 and STILES continued communicating over Signal.  During an exchange, STILES offered firearms for sale.  UC-1 arranged for a controlled purchase to occur on March 4, 2021.

33.  On March 4, 2021 members of the ATF Riverside Field Office, UC-1, UC-3, and GIT members met at the UC location and set up surveillance in the area.

34.  At approximately 3:47 PM, STILES's black Lincoln SUV approached the UC location.  STILES was driving the vehicle and an unknown female was in the front passenger seat.  As he arrived, STILES retrieved a dark duffel bag from the back seat.  UC-3 walked with STILES to a different part of the UC location where they met with UC-1.  Upon entering the room, STILES handed UC-1 a white In-N-Out restaurant paper bag.  Inside the bag, UC-

15

1 saw a quantity of suspected methamphetamine inside of a clear
plastic bag.  STILES additionally provided UCs with a short-
barreled rifle and two privately made 9mm handguns.  UC-3 gave
STILES $5,250 for the guns and methamphetamine.  Approximately
30 minutes later, STILES and the unknown female got back into
the Lincoln SUV and left the UC location.

    35.  In total, ATF UCs purchased the following from STILES
on March 4, 2021:

        a.  404.4 grams of pure methamphetamine, as confirmed
by a DEA laboratory analysis;

        b.  An AR-15 type .223 caliber rifle with a barrel
length of approximately 9 inches;

        c.  Two Polymer 80 privately made 9mm handguns; and

        d.  A black firearms case.



I.    **Fifth Controlled Purchase of Guns from STILES on May 20, 2021**

36.    On April 26, 2021, UC-1 placed a recorded call to STILES.  STILES told UC-1 that he "just got rid of a full automatic Glock" and that he had three AR-15 rifles for sale as well.  STILES then sent UC-1 photographs of the firearms on May 2, 2021.

37.    On May 18, 2021 UC-1 spoke about a future transaction for a rifle, a handgun, and approximately one pound of methamphetamine.  STILES told UC-1 that he was going out of town but would like to sell it to UC-1 as soon as possible.  UC-1 arranged for the controlled purchase to take place on May 20, 2021.

38.    On May 20, 2021 members of the ATF Riverside Field Office and UC-1 met at the UC location and set up surveillance in the area.

39.    At approximately 3:53 PM, surveillance saw STILES drive up to the UC location in the SUBJECT VEHICLE.  STILES pulled the vehicle into the garage of the UC location and retrieved a tan rifle bag from the trunk.  UC-1 walked with STILES inside the UC location when STILES mentioned that another individual was coming with the firearms.  STILES met with an individual, later identified as R.M.T.,[6] in the front of the UC location and walked back inside with him.  STILES sold UC-1 a rifle with a magazine and a rifle case for $1,800, and R.M.T.

---

[6] Law enforcement knows R.M.T.'s full identity, but I do not name him here because I am not seeking a complaint against him at this time.

sold UC-1 two Polymer 80 privately made firearms for $1,800.
Approximately 15 minutes later, STILES left the UC location in
his vehicle while R.M.T. walked out the front and drove away.

40.  In total, ATF UCs bought the following items from
STILES and R.M.T. on May 20, 2021:

      a.  An SKS Sporter 7.62 x 39 rifle;

      b.  Two Polymer 80 privately made 9mm handguns; and

      c.  A black and tan rifle case.



**J.  Investigation of the SUBJECT PREMISES**

41.  To determine STILES's location, I obtained a GPS ping
warrant for his phone number mentioned above on March 2, 2021,
in the Superior Court of the State of California, County of
Riverside, issued by the Honorable James T. Latting.  On March
4, 2021, I received the first GPS pings showing STILES in and
around Palm Desert, California.  On March 5, 2021 the records

were received via electronic mail.  The GPS pings were
terminated on March 16, 2021.

42.  I reviewed the GPS phone pings and determined that
STILES's phone was pinging regularly around the SUBJECT
PREMISES.  I queried the address in law enforcement databases
that comb records like utilities and credit applications, and I
determined that the SUBJECT PREMISES was associated with STILES.
I looked at the data return and followed the GPS phone pings
from the SUBJECT PREMISES to the ATF UC location (during the
fourth controlled purchase) and then saw the phone return back
to the SUBJECT PRESMISEs on March 4, 2021.

43.  On March 8, 2021, at approximately 5:00 PM, ATF SA
Joseph Nazareno conducted surveillance at the SUBJECT PREMISES.
SA Nazareno saw STILES's black Lincoln navigator parked on the
street outside the residence.

44.  On May 13, 2021, at approximately 10:50 AM, I
conducted surveillance at the SUBJECT PREMISES and saw the
SUBJECT VEHICLE in front of the SUBJECT PREMISES.  The vehicle
was parked in front of the southernmost unit, the unit closest
to San Nicholas Avenue.  I queried the license plate and
determined that the SUBJECT VEHICLE is registered to H.R., 83170
Highway 111, Indio, California 92201.  The vehicle is leased out
of the Deluxe Auto Center at the same address and is likely a
newly leased vehicle.  I reviewed the registration on STILES's
previous vehicle, the Lincoln SUV he drove to four of the
controlled purchases, and I saw that it was leased from the same
name and location as the SUBJECT VEHICLE.

45.   On May 17, 2021, at approximately 1:15 PM, I was conducting surveillance at the SUBJECT PREMISES and I saw STILES drive the SUBJECT VEHICLE with an unidentified female in the front passenger seat and park near the SUBJECT PREMISES.  I then saw STILES and the unidentified female walk into the SUBJECT PREMISES.

## IV. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

46.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence

21

or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

47.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual

who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

　　　　b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

　　　　c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

　　　　d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>CONCLUSION</u>

48.   Based on the foregoing, there is probable cause to believe that STILES and SMITH have committed violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (distributing at least 50 grams of methamphetamine) and 21 U.S.C. § 846 (conspiracy to do the same) on December 4, 2020.

49.   Additionally, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the SUBJECT VEHICLE described in Attachment A-2.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  3rd  day of June, 2021.

_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE